Charles F. Murphy, Sigurd E. Naess, and Arthur H. Wells, as Trustees Under Last Will and Testament of Ernest R. Graham, Deceased, v. Ruby Leffingwell Graham, William Graham, Herbert E. Graham, Grace G. Allen, Gregsten Allen, Individually and as Trustee Under Will of William O. Thompson, Frederick G. Allen, Jr., William H. Allen, Eleanor F. Allen, Myrtis S. Graham, an Incompetent Person by Daniel J. Lamont, her Guardian ad litem, Defendants-Appellants, American School of Fine Arts, Defendant-Appellee, Frank Graham and Wilber E. Post, Defendants-Appellees.

Gen. No. 45,683.

45

 Opinion filed December 30, 1952. Rehearing denied January 28, 1953. Released for publication January 28, 1953.

HOPKINS, SUTTER, HALLS, DeWOLFE & OWEN; MOODY, FOSTER & BARRETT, and DANIEL J. LAMONT, all of Chicago, for appellants; DONALD J. DeWOLFE, EDWARD W. BARRETT, and SIDNEY F. MOODY, all of Chicago, of counsel.

CONCANNON, DILLON & SNOOK, of Chicago, for defendants-appellees.

WILSON & McILVAINE, of Chicago, for plaintiffs-appellees; J. F. DAMMANN, CLARENCE E. FOX, and JAMES W. CLOSE, all of Chicago, of counsel.

MR. PRESIDING JUSTICE ROBSON delivered the opinion of the court.

This is an appeal from a decree of the superior court of Cook county construing the will of Ernest R. Graham, deceased, and particularly the Fifth Article thereof. The action was brought by the trustees for instructions as to the proper administration of a trust created by the will.

The will after providing for the payment of debts, claims and taxes, left testator's personal effects to his wife, Ruby Graham; gave her a life estate in the family residence in Chicago, with remainder to the American School of Fine Arts, an Illinois corporation, hereinafter called "School," gave his wife the use for her lifetime of a portrait of him by Orpen with remainder to the School, and gave to the School his Architectural Library and his collection of reproductions of old masters. Then follows the controversial article, the relevant portions of which are as follows:

"FIFTH: I direct my executors, hereinafter named, to set aside and retain in their hands as trustees such an amount in value of the personal property constituting part of my estate at the time of my death as they may select and deem sufficient, so that at all times during the life of the trust by this article created the net amount in each year derived therefrom will be sufficient to provide for the payment of the several annuities from time to time payable under this article of my will, so that the principal of the trust fund hereunder shall at all times during the life of this trust remain intact in the hands of my said trustees, except as the same may be reduced by reason of the death of the beneficiaries hereunder, as hereinafter provided.

"Said fund shall be held by my said trustees, and the survivors and survivor of them, and their successors in trust, for the uses and purposes and with the powers hereinafter set forth:

"In each year from and after my death, I direct my said trustees to make the following payments out of the net income derived from said trust estate:"

The payments so directed are as follows:

| | |
|---|---:|
| To his wife, Ruby Graham, | $30,000 |
| To his son, William Graham, | 6,000 |
| To his sister, Myrtis S. Graham, | 2,000 |

| | |
|---|---:|
| To his brother, Herbert E. Graham, | 2,000 |
| To his half-brother, Frank Graham, | 2,000 |
| To Wilber E. Post, | 2,000 |
| To William O. Thompson, | 2,000 |
| To Katie Wilson, | 800 |

After so providing, the will directs as follows:

"All of the net income remaining in the hands of my said trustees at the end of each year, after paying the foregoing annuities in full, shall be paid over to said American School of Fine Arts."

It then directs that as and when the several beneficiaries die the trustees should transfer to the School the proportionate part of the trust estate previously held by them for the purpose of paying the annuity of the beneficiary who had died; that upon the death of the last beneficiary the trust should terminate and all of the trust estate then remaining transferred to the School; that all the payments of income to the beneficiaries should be made at least quarterly in each year and deemed to accrue from the date of decedent's death to the date of death of said beneficiaries respectively. Beneficiaries Katie Wilson and William O. Thompson died prior to institution of this action. The other beneficiaries are living.

The controversy arises between the School and the beneficiaries because during the years 1942 to 1946, both inclusive, the net income from the trust was insufficient to make the payments provided for in the Fifth Article. There was an aggregate deficiency of $197,350.91. The net income of the trust for the years 1947 to 1950, inclusive, exceeded the aggregate amounts provided to be paid under the Article by $166,365.13. Such excess income was paid to the School, subject to the terms of certain agreements, under which the School agreed to pay to the trustees such amount or

amounts as any court of competent jurisdiction or the interested parties by agreement in writing should determine was to be paid to the beneficiaries by the trustees to make up or settle the deficiencies claimed by them for the years 1942 to 1946, both inclusive.

The trial court held that under the provisions of the Fifth Article of the will, it was not the intention of the testator to make any of the payments from the net income cumulative so that a deficiency occurring in any year or years would be a charge against future surplus income. The beneficiaries contend that the testator in using the language, ''after paying the foregoing annuities in full,'' intended that the excess net income received from any year over and above the aggregate amount payable to the beneficiaries, should first be used for the repayment of any deficiencies in the payment to the beneficiaries before making payments to the School.

 It has been many times stated that the cardinal purpose in the construction of a will is to determine the intention of the testator. *Halderman v. Halderman,* 342 Ill. 550, 553. To determine this, the words of the will must be read in the light of the circumstances under which it was made, including in this the extent and condition of the testator's property as well as his relation to his family and to the beneficiaries named. This process requires a consideration of all the provisions of the will taken as a whole. Each part must be read in connection with every other part and with the general plan of the testator. *Vollmer v. McGowan,* 409 Ill. 306, 311. *Monarski v. Greb,* 407 Ill. 281.

 In the light of these familiar canons of construction, we must analyze the record in an attempt to ascertain the intention of the testator. Before doing so, however, we must first dispose of an issue raised by the beneficiaries in a motion to strike certain por-

49

tions of the answer of the School and to strike a paragraph of the complaint filed by the trustees which set forth facts pertaining to the creation by the decedent during his lifetime of certain trusts for the members of his family. The basis of the motion was that such allegations were prejudicial to the position of the beneficiaries and that it was unnecessary to go beyond the four corners of the will to determine testator's intention. There is no specific language in the will making provision for the payment of deficiencies to beneficiaries and to arrive at the intention of the testator we must, as before stated, take into account the extent and condition of the testator's property as well as his relation to his family and to the beneficiaries. To follow this general rule of testamentary construction we must consider the trusts created by the decedent for the beneficiaries during his lifetime. (*Moody Bible Institute v. Pettibone,* 289 Ill. App. 69; *Abrahams v. Sanders,* 274 Ill. 452; *Sartain v. Davis,* 323 Ill. 269.) The motions were properly denied.

The record discloses that the testator was a highly successful and well known Chicago architect enjoying a national reputation. The firms with which he was associated as a partner were architects of many notable buildings in Chicago and other cities of the United States and Europe. He was an able business man. Over the years he acquired a very substantial estate which at the time of his death on November 22, 1936, was valued in excess of $1,500,000. Testator's family consisted of his wife, her son by a former marriage whom the testator adopted in 1927, a brother, a half-brother and an incompetent sister. All of these individuals were beneficiaries under his will, which was dated February 4, 1936, and admitted to probate in the probate court of Cook county, Illinois.

50

Before he made his will the testator had created four *inter vivos trusts,* two for the benefit of his wife, one for his son, and one for his sister. The first for the benefit of his wife was made in 1932. She was to receive the net income and upon her death the trust property was to be distributed to and made a part of the son's trust. From the trust for the years 1932 to 1950 his wife received a total of approximately $265,-000. In the four years prior to testator's death her average income from it per year was in excess of $20,000 and since the death of testator her average yearly income has been $11,978.18. The second trust for his wife was created in 1935 and consisted of the proceeds of insurance on his life in the net principal amount of $175,000. She was to receive the net annual income and upon her death the entire principal of the trust was to be paid to the School. For the years 1938 to 1950, inclusive, she received $162,972.27 with a net income of $12,536.32 per year. His wife received from these two trusts for the years 1936 to the year 1950 an average yearly income of $22,843.

The testator on May 26, 1932, created a trust for William Graham, his adopted son. The income from this was paid to him beginning in the year 1932 until 1948 when it terminated and the entire principal of $40,000 was turned over to him. His average yearly income from this trust was $2,822.88.

The testator in 1935 created a trust for the benefit of his incompetent sister. She was to receive the net annual income and upon her death the entire principal of the trust was to be paid to the School. Her average income from this trust from the year 1936 to 1950 was $1,746.94.

As early as 1922 the decedent began to assemble an Architectural Library consisting of volumes on architecture, art, landscaping and allied arts, which he had

purchased in various parts of this country and in Europe. There are now approximately 2,500 volumes, many of them irreplaceable, accumulated by the testator for the School, with a value of $70,000 to $75,000.

At the same time the decedent began assembling a collection of reproductions of old masters. He engaged Mrs. Agnes Burrell Nation to assist in assembling these. She worked at this for years and shortly prior to his death the collection consisted of between 250 and 300 pictures, the cost of which was between $80,000 and $100,000. As a part of Mrs. Nation's compensation for this work he established in 1925 a trust, the principal of which was worth in 1950 over $100,000, from which she receives the net income for life, and upon her death the entire trust property is payable to the School.

The School was organized by the decedent as an Illinois corporation not for profit in 1935. It is evident that he had in mind the organization of the School as early as 1925 in that he mentioned it by name in the trust agreement of that date for Agnes Burrell Nation. In his wife's insurance trust of 1935 and in his sister's trust created in 1935, he gives the entire principal upon the death of the life beneficiaries to the School.

The purposes of the School expressed by Mr. Graham in his will are:

"The establishment, maintenance and endowment in the State of Illinois of a school of fine arts, to provide for advanced instruction and training in the nature of post-graduate work in architecture, sculpture and painting and such subjects which are strictly germane thereto, free of any charge therefor."

The School's income has been $19,000 received for the period from 1936 to 1941 when there was excess from the trust created under testator's will. The excess for the years 1947 to 1950 is the subject matter of

this suit. The directors of the School have met on numerous occasions to discuss plans of carrying out testator's will. They have been approached by officials of various colleges with plans for operating the School in conjunction with one of those institutions. They have also considered plans of their own, but have not been able to make or arrange a definite program because of the lack of operating funds.

■■ The beneficiaries ask that this court consider as facts the circumstances under which the income from certain securities held by the trustees decreased during the years when the payments to the beneficiaries were not sufficient to meet the provisions of testator's will. They also ask the court to consider certain representations purported to have been made by the trustees to testator's wife and the fact that the widow by not renouncing under the terms of the will released her dower and statutory rights and became a purchaser. This we cannot do, because the construction of a will cannot be made to depend upon subsequent facts or conditions arising after the will takes effect, nor can this court surmise what provision would have been made by the testator for the beneficiaries had he anticipated a change in circumstances surrounding him at the time of the execution of the will. *Gridley v. Gridley,* 399 Ill. 215; *First Trust and Savings Bank of DeKalb v. Olson,* 353 Ill. 206; *Harvey v. Ballard,* 252 Ill. 57.

■ Applying the facts in the light of the canons of interpretation as heretofore cited, we find that the testator in addition to his will had set up the various trusts that made substantial provision for his widow, his sister and his adopted son. Under the terms of his will he gave his wife, his son, his sister, two brothers and certain friends the first call on the income of the trust created. In each of the years, except the four in question, the beneficiaries received all of the income

53

provided for them. Even in the four in question they received a substantial part of it. We are of the opinion he felt he had adequately provided for his family.

As to the School, under three of the trusts that the testator created during his lifetime, it was the ultimate beneficiary. It is shown that as early as 1925 he had already conceived its establishment. His acts in collecting the Architectural Library and the paintings over the periods of years that followed showed that his interest continued. He incorporated it in December, 1935.

██ Under the terms of the Sixth Article of his will he provided that if the School fail to accept the bequests within two years after his death, the trustees were instructed to form a corporation to carry out the objects for which he had formed the School. This to us is very significant in that it shows testator's desire to have the School an operating and functioning institution as soon after his death as was possible, so that those who were to follow after him in his chosen field of architecture would be afforded opportunities for research and study such as were not available to him at the start of his career. If it had been his desire to have the operation of the School await determination of the trusts, he would have stated this with the same degree of particularity as he provided for the other contingencies in his will. He was a business man of ability and knew that the School could not operate without income.

██ It is generally recognized that by reason of the variety in language used in wills, decisions construing them, while frequently helpful, are not controlling and are less helpful as guides than are the cases upon other subjects. *Love v. Engelke,* 368 Ill. 342; *Rock Island Bank & Trust Co. v. Rhoads,* 353 Ill. 131.

While numerous cases have been cited by the respective parties, there is only one that is closely anal-

ogous to the facts involved here. It is *Fate v. Fate,* 295 Ill. App. 271, which was cited by the School. In that case the testator's will provided:

"During the life of my wife, the net income from my estate, except as otherwise herein disposed of, shall be distributed at least once in each calendar year as follows: My trustee shall pay to my wife the sum of Two Hundred Dollars ($200.00) a month, which shall include the Fifty Dollars a month agreed to be paid to her in prenuptial agreements heretofore executed by us. Out of the remainder of the net income, there shall then be paid to my nephew and nieces, namely, Mayme Fate, Lena Fate, C. Ivan Fate and Grace Fate, the sum of Fifty Dollars per month each, and, in case of the death of either of them leaving descendants, the descendants shall take of the income the share the parent would have taken if living.

"The balance of the net income shall be divided into two shares, one-half of which shall be paid to my wife and the remaining one-half to said nephew and nieces as above provided."

The net income from the trust for a time was inadequate to meet the monthly payment to the testator's wife. The income from the trust later increased and the trustees filed a bill to construe the will. The widow claimed that the deficiencies in her payments were cumulative and should be paid from the subsequent surplus income before any distribution to the beneficiaries receiving the remainder of the income after the monthly payment to her. The trial court held that the payments to testator's wife were not cumulative. She appealed. The Appellate Court in affirming the trial court said:

"Where a will after providing for the payment of certain annuities from an income of a trust fund, ex-

pressly disposes of all surplus income, such a thing as undisposed surplus income is not possible. Hence the effect of such a provision in a testator's will prevents any accumulation of surplus income from which arrearages can be paid. Under such circumstances, the testator's intention that there shall be no such accumulation, is considered manifest. Here the testator, after providing for the payment of the annuities, expressly disposes of all surplus income.''

 · While it is true that the language of the trust provisions in this case do not coincide exactly with the one with which we are concerned, we do, however, find that the testator in our case provided that ''In each year after my death'' the payment from income of specified sums to the beneficiaries and the net income remaining in the hands of the trustees at the end of each year be paid to the School. We believe in the light of all the circumstances that it is clear that the testator meant that each year was a separate period for paying the beneficiaries and that they were to be paid ''in full'' only out of the income collected in that year and that any deficiency was not to be charged against the income of subsequent years.

The beneficiaries rely chiefly on the case of *Chicago Title and Trust Co. v. Morey*, 281 Ill. App. 219, as supporting their contention that the deficiencies in income for the payment to the beneficiaries should be made out of surplus income from subsequent years. This is an opinion of the Second District of the Appellate Court and was written by the same Justice who delivered the opinion in the *Fate* case. In this case the testator directed payment from income of $400 a month to his grandson and $100 a month each to his brother and his housekeeper. The will then made the following provision:

''The excess, if any, over the sum of Six Hundred Dollars ($600.00) per month of the income of my said

trust estate and after all expenses of this trust shall have been paid, shall form a contingent fund, and may, if deemed proper by my said Trustees, be used for the benefit of (testator's grandson) or the same may be added to the principal of said trust estate in the discretion of my said Trustees.''

It can readily be seen that there is a vital difference between the provision of the testator's will in the instant case and that found in the will in the *Morey* case. In the *Morey* case, there was no disposition of the surplus income above the annuities to another intended beneficiary, and in addition the trustees were given the right to hold the income as a ''contingent fund,'' obviously for the purpose of taking care of the annuities whenever the income would be less than the specified amounts.

The court in the *Fate* case after discussing the *Morey* case, said:

''. . . That case as well as many others, recognizes the rule to be that where a testator bequeaths gifts from income of a trust fund to named persons, and makes provision for the total distribution of all excess income over that provided for by the annuity provisions, no deficit could be made up from any surplus income in after years, because the specific directions of the will make such a thing as undisposed surplus income an impossibility, and therefore there could be nothing from which such arrearages could be paid.''

If the testator had desired an accumulation of income such as the beneficiaries contend for, we are of the opinion he would have made a provision similar to that made in the will in the *Morey* case and not expect this court to read such an intention into his will.

There are other contentions that the beneficiaries have raised. To attempt to follow them this court would have to isolate certain language without

57

regard to its relation to the entire will. This we cannot do.

It is our opinion that the interpretation placed by the trial court was the only proper one that could be reached under the circumstances in this case. The decree of the trial court is affirmed.

*Decree affirmed.*

SCHWARTZ and TOUHY, JJ., concur.